UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| PEGGY C. CASH and LENARD D. CASH, § | |
| § | |
| *Plaintiffs*, § | |
| § | |
| *v.* § | Civil Action No.  SA-16-CV-279-XR |
| § | |
| AXA EQUITABLE LIFE INSURANCE § | |
| COMPANY, § | |
| § | |
| *Defendant.* § | |

## ORDER

On this date, the Court considered the status of the above captioned case and its pending motions. After careful consideration, the Court GRANTS Defendant's Motion for Summary Judgment (Docket no. 34) and Motion for Leave to File Sur-Reply (Docket no. 33), and DENIES Plaintiffs' Motion for Summary Judgment (Docket no. 26).

## BACKGROUND

### I.    Factual History

#### a.    Cash's Insurance Policy

Plaintiff Peggy Cash obtained a flexible premium variable life insurance policy from Defendant AXA Equitable Life Insurance Company on August 23, 2000, naming her husband, Plaintiff Lenard Cash, as the insured.[1] Docket no. 30-2 at 2. In short, a flexible premium variable policy "[does] not require fixed premium payments," but rather "allow[s] the policyholder to choose the amount and frequency of payments, which are deposited into an investment account associated with the policy." Docket no. 34 at 4. *Id*. To keep the Policy in force, the Net Cash Surrender Value of the account, which is the value of the account less certain charges, loans, and

---

[1] The factual allegations in this case relate mostly to Peggy Cash; Lenard Cash's involvement in this case is as the insured. References to "Cash" in this order are to Peggy Cash unless otherwise noted.

interest, must be sufficient to cover a monthly deduction on the first day of each policy month (in Cash's case, the 23rd). Docket no. 34-1 at 2–3; *see* Docket no. 30-2 at 9. Otherwise, the Policy defaults. Docket no. 34-1 at 3; Docket no. 30-2 at 15. Though the Policy provides for the payment of planned quarterly premiums (in Cash's case, $6,500.00), the nature of the Policy is that these premiums are neither necessary nor sufficient to prevent the Policy from defaulting; the Policy will default if the Net Cash Surrender Value of the account does not cover the monthly deduction, regardless of whether the quarterly premiums are paid.[2]

The Policy contains the following language regarding a default:

> If the policy is in default, we will send you and any assignee of our records at last known addresses written notice stating that a grace period of 61-days has begun starting with the date the notice is mailed. The notice will also state the amount of payment that is due.

> The payment required will not be more than an amount sufficient to increase the Net Cash Surrender Value to cover all monthly deductions for 3 months calculated assuming no interest or investment performance was credited or charged against the Policy Account and no policy changes were made. If the default occurs during the No Lapse Guarantee or Death Benefit Guarantee period, the payment required will be the lesser of the amount just described or the amount necessary to pass the Guarantee Premium fund test.

> If we do not receive such amount at our Administrative Office before the end of the grace period, we will then: (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

> If we receive the requested amount before the end of the grace period, but the Net Cash Surrender Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61-day grace period has begun and request an additional payment.

---

[2] After obtaining her Policy, Cash doubled the amount of coverage but chose not to increase her planned quarterly premium. Docket nos. 34-2, 34-3, 34-1 at 3. As a result, her Policy constantly defaulted. *See* Docket no. 34-16 at 7–8 (identifying 31 instances of default in Cash's policy over an 11-year period).

Docket no. 30-2 at 15–16. Thus, a default triggers the sending of a notice of lapse, which begins a 61-day grace period for a policyholder to pay the required amount and keep the policy in force without interruption. *See id.*

### b. Cash's Default and First Notice of Lapse

On May 23, 2013, Cash's policy defaulted, according to the affidavit of Jeremy Bottorff, a manager of client relations at AXA. Docket no. 34-1 at 1, 3. This default triggered AXA's computer-automated process for sending Cash a notice of lapse. *Id.* at 3. According to Bottorff, AXA's computer system automatically detects when a policy is in default. *Id.* The system then generates a corresponding notice of lapse, which informs the policyholder that the policy has entered the 61-day grace period and specifies the amount due by the end of the period in order to keep the policy in force. *Id.* at 4. These notices are generated in batches overnight, and are automatically sent electronically to Broadridge Financial Solutions, Inc., a third-party vendor, for printing and mailing. *Id.*

Bottorff testified that this is precisely what happened on May 23, 2013 when AXA's system detected a default in Cash's policy. *Id.* His affidavit includes a report title for a batch of letters that were sent to Broadridge.[3] *Id.* at 4, n.1. Within this batch was the first Notice of Lapse that AXA sent to Cash on May 24, 2013,[4] and Bottorff attached an electronic copy of this notice to his affidavit.[5] *Id.*; Docket no. 34-7. The May 24 Notice notifies Cash that $21,622.00 is due by July 23, 2013 in order to prevent the Policy from terminating.[6] *Id.*

---

[3] Bottorff identifies this report as "CMOD report: UL70PCBR, ULDC45OR-UCLNTPR.CLIENT1."

[4] In their briefing, the parties refer to this Notice of Lapse as the May 23 Notice, but the Court will refer to it as the May 24 Notice because the Policy's 61-day grace period began on the 24th when the notice was sent.

[5] Bottorff stated in a declaration that AXA maintains these notices of lapse in the original electronic format generated by its computer system, but does not maintain them in the format printed and mailed by Broadridge. Docket no. 34-17 at 3. This electronic format is what is attached to Bottorff's affidavit.

[6] The Policy provides that the grace period begins on the date that a notice of lapse is sent. *See* Docket no. 30-2 ("[W]e will send you . . . written notice stating that a grace period of 61 days has begun *starting with the date*

Colleen O'Brien is a client relations manager for transaction reporting at Broadridge, the company that prints and mails AXA's notices of lapse. Docket no. 34-19 at 2. She provided an affidavit discussing the details of the same report referenced by Bottorff.[7] *Id.* at 3. Her affidavit states that on May 23, 2013, Broadridge received two files from AXA, constituting 27 total pieces to be printed and mailed to customers of either AXA or MONY Life Insurance Company; of these 27 pieces, 21 were for customers of AXA. *Id.* at 3. All 27 pieces—including the 21 specific to AXA policies—were "printed, processed, and presented to a third party vendor for mailing on May 24." *Id.*

Herb Eroh is a vice president/general manager at Pitney Bowes Presort Services, Inc., the third-party vendor referenced in O'Brien's affidavit. Docket no. 34-20 at 2. He provided an affidavit indicating that Pitney Bowes contracted to pick up documents printed by Broadridge and deliver them to the USPS for mailing. *Id.* He testified that on May 24, 2013, Pitney Bowes carried out its end of this process by delivering mail from job 307—a job number keyed to AXA documents printed by Broadridge—to the USPS. *Id.*

Cash stated in an affidavit that she never received the May 24 Notice of Lapse; based on this fact, she believes AXA never sent it. Docket no. 32-1. She would have received it at her office, which is the address on file for her policy and the address at which she received previous letters from AXA. Docket nos. 33-5, 33-6. At her deposition, Cash stated that around May 24, 2013, she was out of the office often with medical issues, forcing her employees to regularly carry out an elaborate process to receive mail at the office, deliver it to her for inspection off-site, and return it to the office for filing. Docket no. 34-15 at 4–7.

---

*the notice is mailed*." (emphasis added)). If the grace period began with May 24 being the first day, the 61st day was July 23.

[7] O'Brien also identifies CMOD report: UL70PCBR, ULDC45OR-UCLNTPR.CLIENT1.

### c. Cash's Second Notice of Lapse

On May 28, 2013, Cash made a $6,500.00 payment towards her account. Docket nos. 34-1 at 4, 34-8. Because this payment was less than the amount requested in the May 24 Notice of Lapse, the Policy remained in default, but the payment slightly reduced the total amount due. Docket no. 34-1 at 4. As a result, AXA's automated policy management system recognized a change in the balance but noted that the Net Cash Surrender Value of Cash's policy was still insufficient. *Id.*

Through its automated process described above, AXA sent Cash a second Notice of Lapse on May 29, 2013. *Id.* Cash received the May 29 Notice, though her office temporarily misplaced it and she does not recall precisely when she received it. Docket nos. 34-15, 33-4 at 7. The May 29 Notice, an electronic copy of which is attached to Bottorff's affidavit, informs Cash that $21,616.00 is due by July 23, 2013 in order to prevent the Policy from terminating.[8] Docket no. 34-10. This is the same due date identified in the May 24 Notice of Lapse. Docket no. 34-7.

### d. AXA's Termination of the Policy and Cash's Late Payments

On July 23, 2013, AXA terminated the policy because the 61-day grace period that began with the May 24 Notice ended. Docket no. 26-4; *see supra* footnote 6.

On July 25, Cash mailed a check for $23,054.00 to AXA, earmarking $21,616.00 for payment on the Policy at issue in this case and the remainder for an unrelated policy. Docket no. 34-21. On July 29, noticing that her check had not yet been cashed, Cash sought and received instructions from AXA for completing a wire transfer, and she wired the funds to AXA. Docket no. 34-15 at 8, 14–15. Both payments were refunded via correspondence from AXA dated

---

[8] The parties do not address or explain how a $6,500 premium payment reduced the amount due on the Policy by only $6. Nevertheless, the parties do not dispute this fact, nor do they attribute legal significance to it.

5

August 7 and September 4, 2013 because AXA maintained that the payments came after the expiration of the 61-day grace period. Docket nos. 34-11, 34-12.

In August 2013, Cash applied for reinstatement of the policy, which AXA denied. Docket nos. 34-13, 34-14.

## II.    Procedural History

Peggy and Lenard Cash, citizens of Texas, initially filed this lawsuit in the 225th District Court of Bexar County, Texas on February 16, 2016, seeking monetary relief between $200,000 and $1,000,000. Docket no. 1-1 at 8. On March 18, AXA, a New York corporation with its principal place of business in New York, removed the action to this Court on the basis of diversity jurisdiction. Docket no. 1. Plaintiffs allege a cause of action for breach of contract, and seek a declaration of their rights under the Policy. Docket no. 1-1.

Now before the Court are the parties' motions for summary judgment. Plaintiffs filed a motion for summary judgment on August 18, 2016, Docket no. 26, and AXA filed a motion for summary judgment on October 21, 2016, Docket no. 33. These motions are fully briefed.[9] In general, these motions deal with same factual scenario, refer to one another, and implicate the same issues.

## DISCUSSION

## I.    Standard of Review

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving

---

[9] AXA also filed a motion for leave to file a sur-reply in response to Plaintiffs' motion for summary Judgment. Docket no. 33. The motion for leave is GRANTED and the Court will consider AXA's sur-reply. *See* Docket no. 33-3.

party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## II.    Analysis

The parties main dispute surrounds the May 24 Notice of Lapse. In short, Cash contends that it was never sent because she did not receive it; AXA contends that it was sent, and whether it was received is irrelevant.[10] Under the policy, the effect of the May 24 Notice is significant. If it was sent, the 61-day grace period would start on May 24 (when it was sent) and expire on July 23 (when AXA terminated the Policy). If it was not sent, the grace period would not start until

---

[10] This framing of the issue is consistent with the language of the policy, which states merely that "[AXA] will *send* a written notice that a new 61-day grace period has begun and request an additional payment" without requiring receipt of the notice. Docket no. 30-2 at 16 (emphasis added). The Court will consider the argument that Cash never received the letter only insofar as it is evidence that AXA never sent the letter. *See Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 420 (5th Cir. 2007) ("Evidence of non-receipt can be used to establish that the notice was never mailed.").

AXA sent the May 29 Notice and would expire after July 23, making AXA's termination of the Policy premature in light of the required 61-day grace period.

Cash's claim for breach of contract under Texas law requires (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, LLC*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)). AXA argues that Cash did not perform because she did not tender payment within the 61-day grace period, and that it did not breach the contract because it provided the required grace period.

Cash's stance is that AXA terminated the Policy without providing a 61-day grace period. She makes two arguments on this point. First, she argues that there is a fact issue as to whether the May 24 Notice of Lapse was mailed, meaning that there is a fact issue as to whether AXA terminated the Policy prematurely. Second, she argues that under the Policy, the May 29 Notice triggered a *new* 61-day grace period. Separately from her arguments on the grace period, Cash argues that AXA "ratified the Policy by authorizing, accepting, and keeping premiums after it terminated the Policy." Docket no. 36 at 6. To support this argument, she points out that AXA gave her instructions on how to wire funds and let more than a month pass before refunding the check and wire payments that she made in July 2013.

### a. AXA complied with the Policy's 61-day grace period requirement and properly terminated the Policy.

#### i. There is no fact issue as to whether AXA mailed the May 24 Notice.

"A letter properly addressed, stamped and mailed may be presumed to have been received by the addressee in the due course of the mail." *Wells Fargo Bus. Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944 (5th Cir. 1983). "A threshold question for the application of [this] rule is

whether there is sufficient evidence that the letter was actually mailed." *Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 419 (5th Cir. 2007). "Placing letters in the mail may be proved by circumstantial evidence, including customary mailing practices used in the sender's business." *Kozloff, Inc.*, 695 F.2d at 944. In this context, courts often look to affidavits, declarations, and statements of corporate representatives to prove that a letter was mailed. *E.g., Marsh v. First USA Bank, N.A.*, 103 F. Supp. 2d 909, 919 (N.D. Tex. 2000); *Rodriguez v. U.S. Bank, N.A.*, SA-12-CV-345-XR, 2013 WL 5173125, at *2 (W.D. Tex. Sept. 12, 2013) ("[I]t is well settled that declarations made by corporate representatives are sufficient to prove a corporate act, such as mailing notice by certified mail."). On the other hand, "[e]vidence of non-receipt can be used to establish that the notice was never mailed," although a "bare assertion of non-receipt [cannot] create a genuine issue of material fact to survive summary judgment" because allowing otherwise would essentially require proof of receipt when only proof of mailing is required. *Custer*, 503 F.3d at 420.

*Custer* illustrates the type of evidence needed to create an issue of fact as to whether a letter was mailed. There, the Fifth Circuit reversed a district court's grant of summary judgment because the defendant did not prove that it mailed a letter. *Id*. at 422. The defendant, an employer required to provide health insurance forms to its employees, submitted affidavits from a supervisor of mail services and a benefits analyst to show that it sent a notice of open enrollment to the plaintiff employee. *Id*. at 420. These affidavits, "read together, state that in distributing the . . . notices, [the defendant] followed its normal mailing procedures and [one affiant] specifically state[d] that 'the envelopes were metered for first-class postage and placed in bins for delivery by the United States Postal Service.'" *Id*. The affiants supplied a mailing list used to label the batch of notices at issue, and the list included the plaintiff's name and address. *Id*. On the

receiving end, the plaintiff corroborated his assertion of non-receipt by supplying testimony from four similarly-situated employees who should have received the notice but could not recall receiving it. *Id*. at 420 The Fifth Circuit reversed the district court, holding that summary judgment was improper because the defendant had not produced sufficient evidence of mailing:

> [Defendant] has not produced any business records or other physical evidence that the notice was sent. In fact, [defendant] has presented no evidence, testimonial or otherwise, as to the day on which the notices were mailed . . . Further, the plaintiffs' assertion of non-receipt is supported by the other [employees'] testimony that they also could not recall receiving the notice, and that they regularly retain such notices but could not locate the notice in their records.

*Id*. at 421; *see also Duron v. Albertson's LLC*, 560 F.3d 288, 291 (5th Cir. 2009) (vacating summary judgment where employer submitted no affidavits to support sending and the recipient provided a sworn affidavit indicating non-receipt).

The evidence that created an issue of fact in *Custer* is not present in this case. Bottorff, O'Brien, and Eroh all testified in support of the contention that AXA mailed the May 24 Notice and that the mailing process went as planned on that date. These affidavits provide a step-by-step outline of AXA's general process for mailing notices. They also detail this process *on the specific date* that AXA mailed the specific batch of notices containing the May 24 Notice, unlike the affidavits in *Custer* which spoke in only general terms about the defendant's mailing procedures. Bottorff explains how AXA's computer system automatically generates these types of notices, and also identifies the specific print job that was sent to Broadridge on May 23 (CMOD report: UL70PCBR, ULDC45OR-UCLNTPR.CLIENT1). Docket no. 34-1 at 4. O'Brien stated that on May 23, 2013, Broadridge received this exact job (CMOD report: UL70PCBR, ULDC45OR-UCLNTPR.CLIENT1) from AXA. Docket no. 34-19 at 3. Eroh stated that on May 24, Pitney Bowes picked up job 307 from Broadridge—a job specific to AXA—and delivered it to the USPS. Docket no. 34-20. In addition, Bottorff provided a copy of the May 24 Notice in the

format delivered to Broadridge for printing and mailing.[11] Docket nos. 34-7, 34-17. These job and report numbers, testimony from witnesses as to the mailing process on the specific date at issue, and the electronic copy of the May 24 Notice itself are evidence of the type absent from *Custer*.

The only evidence to support Cash's contention that the May 24 Notice was never sent is her own affidavit, which contains only the conclusory statement that she never received the notice. Docket no. 32-1. Her affidavit does not allege or explain any potential deficiency in AXA's process for sending its notices—either in general or on May 23 and 24. She does not identify others who have not received AXA's notices, as was done in *Custer*.

As a result, the facts of this case, unlike those in *Custer*, raise no genuine issue of material fact as to whether the notice was sent, and this conclusion is bolstered by the results of similar cases. *E.g., Ramirez v. L-3 Communications Vertex Aerospace, LLC*, 3:11-CV-297-CWR-LRA, 2011 WL 6092436, at *4 (S.D. Miss. Dec. 7, 2011); *Rodriguez v. U.S. Bank, N.A.*, SA-12-CV-345-XR, 2013 WL 5173125, at *3 (W.D. Tex. Sept. 12, 2013) ("[The plaintiff's affidavit stating that a notice was not received] does not interject a fact issue as to whether notice was sent. [The plaintiff] is only in a position to comment on whether notice was received and cannot offer personal knowledge as to whether notice was sent, which is the operative question."). AXA has provided sufficient proof to create a presumption that it mailed the May 24 Notice, and Cash's only attempt to rebut that presumption is her own, conclusory statement that

---

[11] Cash attacks the credibility of this copy of the May 24 Notice by pointing out differences between it and the version of the May 29 Notice of Lapse that she received. *Compare* Docket no. 34-7 (AXA's copy of the May 24 Notice, which appears on plain letterhead with no bar code) *with* Docket no. 26-3 (Cash's copy of the May 29 Notice, which appears on AXA letterhead and contains a QR barcode). These differences, she argues, show that the May 24 Notice was never sent. As an initial matter, AXA provided a copy of the May 29 Notice in an electronic format identical to its copy of the May 24 Notice, which is consistent with Bottorff's description of the records that AXA maintains. Docket no. 34-10. Moreover, Cash overlooks Bottorff's description of AXA's recordkeeping practices. AXA never maintained that it keeps a copy of all notices in the format received by the policyholder. Instead, it keeps them in the format that it sends to Broadridge. Therefore, these differences are immaterial—they contrast the electronic format that AXA generates with the print format that Broadridge mails.

she never received it. This does not prevent summary judgment, and the Court finds that there is no genuine issue of material fact regarding whether the May 24 Notice was mailed.

### ii.   The May 29 Notice of Lapse did not require a new 61-day grace period.

Having found that the May 24 Notice was mailed, the Policy dictates that the 61-day grace period began on May 24 and ended on July 23. Cash argues, however, that the May 29 Notice began a *new* 61-day grace period, and that termination before the end of the new period breached the Policy. In support of this contention, Cash cites the following language from the Policy: "If we receive *the requested amount* before the end of the grace period, but the Net Cash Surrender Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61-day grace period has begun and request an additional payment." Docket no. 30-2 at 15–16 (emphasis added).

As AXA points out, Cash takes this language out of context. "The requested amount" is a reference to policy language two sentences earlier—"If the policy is in default, we will send you and any assignee of our records at last known addresses written notice stating that a grace period of 61-days has begun starting with the date the notice is mailed. *The notice will also state the amount of payment that is due.*" Docket no. 30-2 at 15 (emphasis added).

The May 24 Notice of Lapse stated that $21,622.00 was due by July 23. Docket no. 34-7. Cash paid $6,500.00 on May 28. Docket no. 34-8. Because her May 28 payment did not fulfill "the requested amount" from the May 24 Notice of Lapse, Cash was not entitled to a new 61-day grace period; in fact, the May 29 Notice itself notes that the termination date remains unchanged. Docket no. 34-10. As a result, there is no genuine issue of material fact as to whether AXA breached the Policy by terminating it on July 23, 2013.

12

**b.  AXA did not ratify the Policy or waive forfeiture of the Policy.**

Cash argues that AXA, in receiving late payments on the Policy, either ratified the Policy or waived Cash's forfeiture of the Policy. In particular, Cash points to the July 25 check that she mailed to AXA and the July 29 wire transfer that she made to AXA when she realized that her check had not been cashed. She argues that AXA giving her instructions on how to wire funds, along with the month-long delay in refunding her payments, constitutes either ratification or waiver.

"Ratification is the adoption or confirmation, by one with knowledge of all material facts, of a prior act which did not then legally bind that person and which that person had the right to repudiate." *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 732 (Tex. App.— Fort Worth 2008, pet. dism'd). The elements of ratification are: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act. *Providian Nat. Bank v. Ebarb*, 180 S.W.3d 898, 901 (Tex. App.—Beaumont 2005, no pet.). Waiver, which is similar, "is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). The elements of waiver are: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Id.*

As mentioned, AXA refunded both the check and the wire transfer. The first refund was issued on August 7 and the second on September 4. Though these refunds were not instant, they show that AXA never acted or intended to validate the payments or continue the Policy. In light of these refunds, Cash's argument that AXA "kept Plaintiff's premiums after Defendant

terminated the Policy" is at odds with the undisputed facts set forth in Cash's own deposition and the two letters AXA sent to Cash for each refund. Docket nos. 34-10, 34-11, 34-15 at 14–15. In addition, AXA providing Cash with instructions for how to wire the money does not constitute ratification or waiver. Cash's deposition testimony on the point does not indicate that AXA knew Cash wanted to wire funds for an already-terminated policy. Docket no. 34-15 at 4, 8, 15. Even if it had, the refunds again show that AXA never intended to validate the payments or waive the forfeiture of the Policy.

## CONCLUSION

Defendant AXA's Motion for Summary Judgment (Docket no. 34) and Motion for Leave to File Sur-Reply (Docket no. 33) are GRANTED. Plaintiffs' Motion for Summary Judgment (Docket no. 26) is DENIED. Plaintiff's claims are hereby DISMISSED WITH PREJUDICE. The Clerk is directed to issue a Judgment in favor of the Defendant, and that Plaintiffs take nothing on their claims. Defendant may submit its Bill of Costs within 14 days in the form directed by the Clerk should it desire to pursue these costs.

It is so ORDERED.

SIGNED this 19th day of January, 2017.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE